This is an appeal from a judgment of the Wood County Court of Common Pleas, Juvenile Division, which granted permanent custody of Brian L. to the Wood County Department of Human Services ("DHS"). For the reasons stated herein, this court affirms the judgment of the trial court.
Appellant, Teresa L., mother of Brian L., sets forth the following assignments of error:
"ASSIGNMENTS OF ERROR
 "Assignment of Error Number One: The Trial Court erred in holding that permanent custody of a child may be awarded to a public children services agency having long term foster care of a child under circumstances wherein a guardian ad litem (sic), and not a public children services agency, files a Motion for Permanent Custody.
 "Assignment of Error Number Two: The Trial Court erred in finding pursuant to R.C. 2151.414(E) that Brian L[.] should not be placed with Appellant.
 "Assignment of Error Number Three: The Trial Court erred in finding that granting the motion for permanent custody was in the best interest of Brian L[.]."
The following facts are relevant to this appeal. Brian was born on January 15, 1988. In December 1994, DHS sought protective custody of Brian after investigating reports that Teresa had neglected to provide Brian with safe, stable and sanitary living conditions. On December 15, 1994, DHS filed a complaint alleging neglect. The complaint stated that the home in which Brian lived with appellant was found to be a nuisance because it lacked gas and had overcrowded living conditions. The complaint also stated that appellant and Brian had been evicted from that home and were living with friends. Additionally, Brian had a chronic head lice problem that had gone untreated by appellant and he had been continually absent from school. An expedited hearing was held on December 27, 1994 and protective services were commenced. A guardian ad litem ("GAL") was appointed for Brian as well as a court appointed special advocate ("CASA"). Counsel was appointed for appellant. DHS was granted temporary custody in April 1995 due to appellant's continued homelessness and Brian was placed in foster care. DHS created a case plan with reunification with appellant as the goal.
In regard to appellant, the original case plan, filed on January 11, 1995, set forth that appellant was to locate and maintain a safe and stable home for herself and Brian; ensure that she has the resources necessary to pay rent and utilities and keep the home free of unsanitary conditions; ensure that Brian attends school every day; properly treat and ensure that Brian remains lice and nit free; and participate in a drug and alcohol evaluation and successfully complete all treatment recommendations. The original case plan was amended eleven times; amendments included appellant developing a positive relationship with Brian and being aware of his needs, not exposing Brian to risk, and participating in family therapy and visits with Brian.
Temporary custody was extended several times due to appellant's failure to meet the objectives of her case plan. In February 1997, DHS filed a motion for long-term foster care and the trial court granted this motion on April 22, 1997. In July and October 1997, DHS filed motions to have Brian's custodial status renewed because appellant had failed to comply with the objectives of the case plan. In October 1997, DHS investigated a possible placement of Brian with appellant's father and his wife; however, in June 1998, these individuals determined that they could not provide a permanent home for Brian.
Both Brian's CASA and GAL filed reports recommending that permanent custody was in Brian's best interest. On October 21, 1998, Brian's GAL filed a motion for an order placing Brian in the permanent custody of DHS. On May 5, 1999, appellant filed a motion to dismiss the motion filed by Brian's GAL, arguing that Brian's GAL lacked standing to file the petition. On May 7, 1999, the trial court denied appellant's motion.
On May 6 and 10, 1999, the trial court held a hearing on the motion filed by Brian's GAL. Prior to taking any testimony, the trial court conducted an in camera interview with Brian, as requested by appellant. During the interview, Brian stated that he did not want to go back to appellant, that he did not feel safe when he was with appellant, that it would be all right if he did not see his blood relatives again, that he wanted to go with someone else so that he could have a mom and dad.
The administrator of the DHS programs testified in regard to her involvement in this case over the past two years. She testified that DHS first became involved with this family in February 1994 after receiving the first environmental neglect referral. The referral was that the home was unfit, that there was no food, and that Brian was not attending school. The first referral was not substantiated and no action was taken. Four more referrals were received between July 1994 and when protective services were ordered on December 27, 1994. DHS worked with appellant following the earlier referrals about what to change but no progress or change occurred so DHS filed a motion for protective services. The original case plan set forth supra was developed with reunification of Brian and appellant as the goal.
The parenting educator who worked with appellant testified that appellant attended three of a four class parenting series that she taught in 1996. The educator testified that appellant was attentive but quiet in the sessions and did not share any comments or ideas. The educator testified that she could not gauge what if any benefit appellant derived from the classes.
The DHS caseworker who had worked with this family from March 1995 through September 1997 testified. She testified that appellant was homeless in April 1995 and that her whereabouts were unknown at that time as she had moved from the last address that DHS had received for Brian and her. She testified also that Brian continued to miss school due to head lice. She testified that DHS obtained possession of Brian on April 19, 1995; Brian was placed in his first foster home. She also testified that Brian, who was seven years old at the time, was removed from this first foster home due to inappropriate sexual behavior with one of the other children in the home. She testified that Brian was then placed at a residential unit at the Children's Resource Center ("CRC") for approximately one month before he was placed in a specialized foster home with foster parents who had received training to deal with the type of behavior Brian was exhibiting; Brian has remained with these foster parents since. The caseworker also testified that Brian began therapy while at CRC and that he has continued with the same therapist, working on the sexualized behavior, his aggression and the separation between him and his family. The caseworker testified that Brian had little contact with appellant from the time Brian was removed in April 1995; she testified that there were no visits from June 27, 1995 until December 12, 1995 even though DHS offered weekly visits to appellant. Appellant developed a pattern of missing visits or canceling visits at the last moment; appellant did not have a vehicle and appellant cited transportation as a problem throughout the four years of this case. DHS worked with appellant's lack of transportation by re-scheduling visits to better fit appellant's schedule, providing reimbursement to appellant's friends who transported her, and transporting Brian to appellant's home for bi-weekly supervised visits which began in July 1996. The supervised visits at appellant's home could have been in addition to the weekly supervised visits at DHS, but appellant did not avail herself of the later opportunities to visit with Brian. After a period of one to two months of successful supervised visits at appellant's home, DHS began unsupervised visits at appellant's home even though appellant had not fully complied with the case plan. The caseworker explained that this was unusual but that DHS wanted to work with appellant's transportation problem. However, the unsupervised visits at appellant's home were ended when safety concerns arose.[1]
This caseworker also testified that family therapy for Brian and appellant was begun in December 1996 but appellant's attendance was sporadic. Appellant attended less than fifty percent of the family therapy appointments. This DHS caseworker testified that appellant stated she did not see the need for family therapy. This DHS caseworker also testified that she did not believe reunification was in Brian's best interests.
Another DHS caseworker who had worked with the family since September 1997 also testified that although reunification with appellant was the goal when she took over the case, the goal was subsequently changed to permanent custody. This DHS caseworker testified that DHS explored permanent placement with appellant's father and his wife but this couple determined that they could not take permanent custody of Brian. This caseworker testified that she also discussed permanent placement with appellant's mother but that appellant's mother indicated that she was not in a position to take permanent custody. This caseworker testified that although appellant had obtained stable housing and employment, appellant had not participated in family therapy. This caseworker also testified that appellant canceled meetings between appellant and the caseworker even though further visits with Brian were contingent on these meetings with the caseworker. In regard to visits with Brian, from December 1997 through 1998, of the approximately eighteen opportunities for visits, appellant kept nine visits. In this caseworker's opinion, Brian needs a permanent home and that was not possible with appellant.
The therapist that treated Brian since the summer of 1995 testified that she initially saw Brian on a weekly basis, working on more appropriate skills to use when he was angry rather than shouting or using inappropriate words. When she met Brian, he used words that were not appropriate for a child to use. The therapist stated that appellant's canceling visits and lack of visiting with Brian was another area she worked on with Brian. The therapist opined that after one year in a structured foster home and a structured school setting, Brian had made progress, both academically and emotionally. Weekly family therapy sessions with Brian and appellant began in January 1997 and lasted for one year; the therapist stated that appellant attended approximately half the scheduled sessions. When appellant missed a session, Brian would be quite disappointed. The therapist also testified that when Brian told appellant that he had not felt safe during an overnight visit to appellant's house, appellant became defensive and did not listen to Brian's concern. The therapist also testified that when she told appellant that Brian did not like other people at appellant's home during his visits and that the visits were for Brian to be with appellant, appellant stated that Brian really did not mind that much and that they were her friends. The therapist opined that appellant had not taken Brian's concerns seriously because this pattern of other people being at appellant's home during Brian's visits continued. The therapist also opined that appellant did not have an understanding of Brian's development and his need for supervision, support and one-on-one time. The therapist testified about one session in which Brian told appellant that he was upset about a visit during which men had been at appellant's apartment drinking; that in the future, he wanted to stay with his grandmother where he felt safe; and that appellant needed to learn how to care for him. The therapist testified that appellant then told Brian that his foster parents could keep him, that this might be the last time he would see her and then appellant left the session. The therapist also testified that when appellant missed a therapy session she did not call and inquire about Brian.
The foster mother with whom Brian had lived for almost four years testified that when Brian first came to her home, he had a really bad temper and swore so much that neighborhood parents would not let Brian play with their children. Brian was seven years old at that time. The foster mother described two instances when Brian returned after visitation at appellant's home with bruises, a cut and scratches. The foster mother testified that Brian needs supervision and monitoring in regard to what and how much he eats. She also testified that appellant had telephoned Brian four or five times during the almost four years he had lived in foster care.
Two of appellant's friends testified on her behalf. One, a former co-worker, testified that he provided transportation for appellant to visits with Brian and also was at appellant's apartment during Brian's visits. He testified that he was present when Brian reported that his cousin had hit him; he heard the cousin state that they had been wrestling and heard appellant make them apologize to each other. He denied seeing any marks on Brian as a result of this incident. He believed that Brian would be lying if Brian reported that his cousin beat him up and all appellant did was tell his cousin to knock it off. Appellant testified as to obtaining housing and employment; she testified that she only remembered being told to do these two things in order to be reunited with Brian. Appellant testified that she was not aware that her case plan required her to obtain a therapeutic assessment or to attend counseling. She admitted that initially she did not think that she and Brian needed counseling but that as time went on, she thought Brian needed someone to talk with. She testified that she has never met with or talked to Brian's GAL and that the GAL has never requested an interview with her. She testified that she would be willing to pursue counseling and that she felt that DHS did not give her a chance. On cross-examination, appellant admitted that she had been convicted of possession of marijuana; she stated that someone else had placed the marijuana in her attic. She stated that because no one at DHS or at her alcohol and drug assessment asked her specifically about drug convictions, she did not think that she needed to tell anyone about the conviction. She also admitted that she had been convicted for shoplifting. Appellant's testimony was that since DHS had taken Brian, he has been embellishing, exaggerating or fabricating stories; that the caseworker was mistaken about appellant swearing on the telephone; that if appellant swore or used inappropriate language, she did not remember saying it; and that she was confused about what was going on because things were never explained in detail. Appellant also disputed the testimony of Brian's therapist in regard to the session appellant left after telling Brian that his foster parents could keep him and that this might be the last time he would see her; appellant stated that she became upset when Brian told her she needed to be a better parent and take care of him more properly and that Brian screamed at her. Appellant stated that the therapist's case notes are incorrect and that she did not say what was attributed to her. Appellant explained that she did not telephone Brian at the foster home more because she was not told she could.
Also before the trial court were six videotapes admitted into evidence. These videotapes were of supervised visitation sessions of appellant with Brian at DHS.
On May 24, 1999, the trial court entered a judgment entry awarding permanent custody of Brian to DHS. Appellant filed a timely notice of appeal.
In her first assignment of error, appellant argues that the trial court erred in holding that permanent custody of a child may be awarded to a public children services agency having long term foster care when a guardian ad litem, not a public children services agency, files a motion for permanent custody. This court finds no merit in this assignment of error.
R.C. 2151.415(F) provides that a neglected child's GAL may petition the trial court to modify an existing dispositional order and to issue a permanent custody order.[2] R.C.2151.415(A)(4) sets forth the dispositional order of "permanently terminating the parental rights of the child's parents." In this case, Brian's GAL did have standing to file the motion seeking to place Brian in the permanent custody of DHS. See, In re Shepherd, (Sept. 29, 1999), Highland App. No. 99CA04, unreported. (Child's legal custodians may file petition pursuant to R.C. 2151.415(F) for a termination of parental rights although their legal status in relation to the child would not be immediately affected; permanent custody would vest with a public children services agency or a private child placing agency.)
Accordingly, appellant's first assignment of error is found not well-taken.
This court will address appellant's second and third assignments of error together as they raise related issues. In her second assignment of error, appellant argues that the trial court erred in finding that Brian should not be placed with appellant. In her third assignment of error, appellant argues that the trial court erred in finding that granting the motion for permanent custody was in the best interest of Brian. This court finds no merit in these assignments of error.
R.C. 2151.414(E)[3] requires the trial court to find that the child cannot be placed with either of his or her parents within a reasonable time or should not be placed with the parents once the court has determined by clear and convincing evidence that one or more of the enumerated factors exist. Once the trial court finds from all relevant evidence that one of the enumerated factors exists, it then must consider whether permanent commitment is in the best interest of the child. R.C. 2151.414(D).[4]
Only then may it grant permanent custody of the child to the agency.
On appeal, this court must determine if the lower court complied with the statutory requirements of R.C. 2151.353 and2151.414 and whether there was sufficient evidence to support a finding by clear and convincing evidence that one or more of the factors listed in R.C. 2151.414(E) exist. Permanent custody may not be granted unless the trial court finds clear and convincing evidence that one or more of the enumerated factors in R.C.2151.414(E) exist. In re William S. (1996), 75 Ohio St.3d 95,101. Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven. Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus. The trial court must consider the best interests of the child by examining the factors listed in R.C. 2151.414(D). An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof. In re Adoption of Holcomb (1985), 18 Ohio St.3d 361,368 and In re Ball (1982), 5 Ohio App.3d 56, 58.
This court has thoroughly reviewed the entire record in this case. Upon consideration of the law and of the entire record of the proceedings in the trial court, this court finds that there was clear and convincing evidence presented at the hearing to support the trial court's decision. The evidence clearly supports the trial court's award of permanent custody and the trial court's decision that permanent commitment to DHS was in Brian's best interest.
Accordingly, appellant's second and third assignments of error are found not well-taken.
On consideration whereof, the court finds that substantial justice has been done the party complaining, and the judgment of the Wood County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal.
PETER M. HANDWORK, J.
MELVIN L. RESNICK, J. AND JAMES R. SHERCK, J., CONCUR.
[1] Brian's foster mother and caseworkers testified about the following instances of safety concerns. In some instances, appellant's testimony in regard to the instances is included.
After the Thanksgiving 1996 visit, Brian reported that he had to sleep on a couch with appellant because a man was sleeping in Brian's bed. Brian also reported that he was scared to be at appellant's house. When asked about this, appellant stated that Brian was scared to sleep in his bedroom; that she could not find a night light; and that Brian wanted to sleep on the couch with appellant. She testified that Brian was fibbing.
After the 1996 Christmas visit, Brian also reported that when he woke appellant on Christmas morning, she told him to open his presents by himself and then to go back to bed. When he later woke appellant again because he was hungry, she told him to eat candy from his Christmas stocking because she was tired and did not want to get up; Brian ate candy for breakfast and became ill with an upset stomach. Appellant also ended this visit two hours early when she called the foster parents and asked them to pick Brian up.
After a January 1997 visit, Brian reported that appellant's house was too cold; that he slept with his jacket on; and that appellant would not get up in the morning to give him breakfast. Brian returned to his foster home with a very bad cold.
After a March 1997 visit, Brian reported that a man and his two children were staying in appellant's one bedroom apartment and, therefore, Brian stayed at his grandmother's house instead of with appellant. Brian also reported that this man swung Brian around by his feet and Brian hit his head; Brian sustained a cut to his forehead and a "goose egg" on his head. When asked about this, appellant stated that Brian was lying about this incident; that the man did not swing him; that her sixteen year old sister may have been wrestling with Brian; and that appellant did not notice that Brian had either a cut or a "goose egg" on his head. Appellant also stated that the man was staying with her because her house had been broken into and she was afraid to be alone. Appellant also stated that Brian lies a lot.
In August 1997, when a caseworker from Specialized Alternatives for Families and Youth (SAFY) transported Brian to appellant's home for a visit, appellant did not initially answer the door and finally opened a window, telling Brian and the SAFY worker that appellant did not know the visit was for that day and wanted to make arrangements to bring Brian back the next day. Brian cried on the way to his foster home and asked to see his therapist.
After a 1997 visit over Labor Day weekend, Brian reported that he stayed at his grandmother's house after he and appellant argued; Brian reported that appellant stated: "I don't care if you want to live with me or someone else. You can kiss my ass."
After a visit in September 1997, Brian reported that appellant had a party with loud music at her house; that there were people drinking; and that when he tried to sleep, men kept coming into his bedroom trying to talk to him; and Brian reported that he was scared.
After another visit in September 1997, Brian reported that a cousin staying with appellant had "beaten him up"; Brian had bruises and scratches on his face and legs. Brian reported that appellant just told his cousin "To knock it off." Unsupervised visitation was terminated after this visit.
[2] R.C. 2151.415 provides:
 "(F) The court, on its own motion or the motion of the agency or person with legal custody of the child, the child's guardian ad litem, or any other party to the action, may conduct a hearing with notice to all parties to determine whether any order issued pursuant to this section should be modified or terminated or whether any other dispositional order set forth in divisions (A)(1) to (5) of this section should be issued. After the hearing and consideration of all the evidence presented, the court, in accordance with the best interest of the child, may modify or terminate any order issued pursuant to this section or issue any dispositional order set forth in divisions (A)(1) to (5) of this section. In rendering a decision under this division, the court shall comply with section 2151.42 of the Revised Code."
[3] R.C. 2151.414(E) provides:
 "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 "(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 "(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
 "(6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.21, 2907.22, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
 "(7) The parent has been convicted of or pleaded guilty to one of the following:
 "(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 "(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 "(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 "(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 "(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 "(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 "(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
"(10) The parent has abandoned the child.
 "(11) The parent has had parental rights involuntarily terminated pursuant to section 2151.353, 2151.414, or 2151.415
of the Revised Code with respect to a sibling of the child.
 "(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
 "(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
 "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 "(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
"(16) Any other factor the court considers relevant."
[4] R.C. 2151.414(D) provides:
 "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition issued under section 2151.353 or 2151.415 of the Revised Code for twelve or more months of a consecutive twenty-two month period ending on or after the effective date of this amendment;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 "(5) Whether any of the factors in divisions (E)(7) to (12) of this section apply in relation to the parents and child."